SEALED

ORIGINAL

**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

FILED-USDC-NDTX-DA
'25 JUL 10 AM10:49

UNITED STATES OF AMERICA *ex rel.*
EIYO BOWL LLC,

*Plaintiff-Relator*,

v.

GEN RESTAURANT COMPANIES, LLC; GEN RESTAURANT GROUP, INC.; DAVID WOOK JIN KIM; JAE HYUK CHANG; MICHAEL B. COWAN; JONATHAN GREGORY; DAVID PARK; JU HEE HAN; GEN RESTAURANT MANAGEMENT LLC; GEN DEVELOPMENT, LLC; GEN ALHAMBRA, LLC; GEN CARROLTON, LP; GEN CERRITOS LLC; GEN CHINO HILLS, LP; GEN CONCORD, LLC; GEN FREMONT, LP; GEN FRISCO LP; GEN HOUSTON LLC; GEN MILPITAS, LP; GEN MOUNTAIN VIEW, LP; GEN NORTHRIDGE, LP; GEN PEARLRIDGE LLC; GEN RANCHO CUCAMONGA, LP; GEN ROWLAND HEIGHTS, LP; GEN SACRAMENTO LP; GEN SAN JOSE, LP; GEN TORRANCE, LLC; GEN WESTGATE, LP; OBU SAN JOSE LP; OBU DEVELOPMENT, LLC; BROTH RESTAURANT GROUP, LLC; CALIFORNIA GOGI GROUP, LLC; INTELON GEN INVESTMENT, LLC; KLW INVESTMENT, LLC; JANG LAWRENCE HYUN YOO; JONGTAE KIM; JC GROUP INTERNATIONAL, INC.; OCTOPUS RESTAURANT GROUP, LLC; OCTOPUS RESTAURANT LONG BEACH, INC.; PACIFIC GLOBAL DISTRIBUTION, INC; GEN ARIZONA LLC; GEN CALIFORNIA LLC; GEN NEVADA, LLC; GEN RESTAURANT GROUP, LLC; GEN RESTAURANT INVESTMENT, LLC; TOMIKAWA RESTAURANT, INC.; and WISE UNIVERSAL, INC.,

*Defendants*.

Civil Action No. 3-25CV1802-S

**COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS UNDER 31 U.S.C. § 3729 *ET SEQ.***

**FILED UNDER SEAL PURSAUNT TO 31 U.S.C. § 3730(b)(2)**

**JURY TRIAL DEMANDED**

## TABLE OF CONTENTS

**Page**


I. INTRODUCTION ..... 1
II. JURISDICTION AND VENUE ..... 3
III. PARTIES ..... 3
 A. Relator ..... 3
 B. Defendants ..... 5
  1. GEN Korean Parent Companies ..... 5
  2. Defendants Associated with David Kim ..... 5
  3. Defendants Associated with Jae Chang ..... 7
IV. STATUTORY AND REGULATORY BACKGROUND ..... 9
 A. The Effects of the COVID-19 Pandemic on the Restaurant Industry ..... 9
 B. The RRF Program ..... 11
  1. Overview ..... 11
  2. Application Process ..... 12
  3. Priority Status ..... 14
 C. The Paycheck Protection Program ..... 17
  1. Statutory and Regulatory Background ..... 17
  2. Application Process ..... 18
V. DEFENDANTS' FRAUDULENT SCHEME ..... 20
 A. RRF Fraud ..... 20
 B. PPP Fraud ..... 26
VI. CAUSES OF ACTION ..... 29
VII. PRAYER FOR RELIEF ..... 30
VIII. JURY DEMAND ..... 30

# COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS

This action is brought on behalf of the United States of America and the State of New York by Eiyo Bowl LLC ("Relator"), by and through its attorneys, against Defendants Gen Restaurant Companies, LLC; Gen Restaurant Group, Inc.; David Wook Jin Kim; Jae Hyuk Chang; Michael B. Cowan; Jonathan Gregory; David Park; Ju Hee Han; Gen Restaurant Management LLC; Gen Development, LLC; Gen Alhambra, LLC; Gen Carrolton, LP; Gen Cerritos LLC; Gen Chino Hills, LP; Gen Concord, LLC; Gen Fremont, LP; Gen Frisco LP; Gen Houston LLC; Gen Milpitas, LP; Gen Mountain View, LP; Gen Northridge, LP; Gen Pearlridge LLC; Gen Rancho Cucamonga, LP; Gen Rowland Heights, LP; Gen Sacramento LP; Gen San Jose, LP; Gen Torrance, LLC; Gen Westgate, LP; Obu San Jose LP; Obu Development, LLC; Broth Restaurant Group, LLC; California Gogi Group, LLC; Intelon Gen Investment, LLC; KLW Investment, LLC; Jang Lawrence Hyun Yoo; Jongtae Kim; JC Group International, Inc; Octopus Restaurant Group, LLC; Octopus Restaurant Long Beach, Inc.; Pacific Global Distribution, Inc; Gen Arizona LLC; Gen California LLC; Gen Nevada, LLC; Gen Restaurant Group, LLC; Gen Restaurant Investment, LLC; Tomikawa Restaurant, Inc.; and Wise Universal, Inc. (collectively, "Defendants"), under the *qui tam* provisions of the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33.

## I. INTRODUCTION

1. This is an action to recover damages and civil penalties on behalf of the United States arising from false statements and claims that Defendants knowingly presented or caused to be presented to the United States.

2. In 2020 and 2021, Congress established the Restaurant Revitalization Fund ("RRF") Program. The RRF was intended to be a multibillion-dollar lifeline for restaurants whose business had suffered during the COVID-19 pandemic. The program was administered by the U.S. Small Business Administration ("SBA").

3. Under the RRF Program, an eligible business was entitled to apply for a grant of up to $10 million to support its ongoing operations. To ensure that the limited funds available through the RRF Program went only to the businesses that needed them most, Congress and the SBA established various rules concerning eligibility for the RRF Program. These rules were straightforward, clear, and easily accessible. Among other restrictions, only certain small business concerns were eligible for priority treatment in having their applications reviewed.

4. Most applicants had no difficulty complying with these rules. Several businesses, however—either with actual knowledge, deliberate indifference, or reckless disregard of the truth—knowingly flouted the RRF eligibility rules to obtain money to which they were not entitled.

5. Defendants are extraordinarily successful restaurateurs who operate a large chain of restaurants called GEN Korean, along with several other restaurant ventures. Despite the restaurants' large combined annual revenue and their owners' significant wealth—both of which were well above the thresholds to qualify for priority status—Defendants falsely certified that they were small businesses eligible for priority treatment under the RRF Program. In so doing, these businesses improperly jumped the line in front of hundreds of thousands of RRF applicants who honestly represented that they did not qualify for priority status.

6. Compounding Defendants' fraud, the illegality of their scheme was made even worse when they failed to deduct their Paycheck Protection Program ("PPP") proceeds from their RRF grant amounts as required by law. Thus, these grants—which were already procured by fraud in the first place—were also unlawfully inflated.

7. The fraud on the RRF Program has doubly harmed American taxpayers. *First*, ineligible businesses have wrongfully obtained tens of millions of dollars to which they were not entitled. *Second*, many businesses that ought to have received funding under the RRF Program

were unable to do so. Every dollar that went to an ineligible applicant is a dollar that could have helped an eligible applicant to remain solvent and to continue supporting the local economy.

8. Moreover, Defendants' businesses received far more than $4 million in second-draw PPP loans: the maximum amount available to restaurants within a single corporate group.

9. In total, Defendants wrongfully received tens of millions of dollars in government assistance to which they were not entitled. They used their ill-gotten gains to further expand their restaurant empire, crowding out smaller competitors who played by the rules and were shut out of the RRF Program.

## II. JURISDICTION AND VENUE

10. The Court has subject-matter jurisdiction over this action under 31 U.S.C. §§ 3732(a) & (b). The Court has personal jurisdiction over Defendants because, among other things, Defendants are headquartered in, do business in, or reside in this judicial district.

11. Venue is proper in this district under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c). Acts proscribed by 31 U.S.C. § 3729 occurred in this district and Defendants are headquartered in and/or reside in this district.

## III. PARTIES

### A. RELATOR

12. Relator Eiyo Bowl LLC is a New York corporation headquartered in Kings County, New York. Eiyo Bowl LLC does business as AO Bowl.

13. Relator is owned and managed by Zachary Howitt, an entrepreneur and military veteran. In 2019, he fulfilled a longstanding aspiration to sign a lease for a new restaurant in New York. Inspired by his experience in Japan while deployed with the U.S. Navy, Mr. Howitt intended to open a restaurant called AO Bowl, serving healthy and affordable bowls and smoothies.

14. The buildout of AO Bowl was complete by April 2020. However, because of the COVID-19 pandemic, Mr. Howitt was forced to delay the opening of his restaurant until early 2021. Although the economic devastation of the pandemic ordinarily may have convinced Mr. Howitt to close his restaurant, Mr. Howitt was hopeful that the RRF program could save his business. Because RRF grants were available only for businesses that were open at the time of their application, Mr. Howitt kept his restaurant open, incurring significant debt. Ultimately, AO Bowl did not receive an RRF grant and Mr. Howitt was forced to close his restaurant after failing to receive assistance from the RRF Program—tens of millions of dollars of which went to ineligible businesses instead.

15. Based on his expertise as a restaurateur, the knowledge of the RRF Program he gleaned from working with industry trade groups and advocating for additional funding for needy restaurants, and the information he learned from conducting an independent investigation and speaking with his contacts in the restaurant industry, Mr. Howitt was able to detect and uncover numerous instances of fraud whereby ineligible businesses wrongfully obtained RRF grants.

16. Relator is in a unique position to provide expert insight into Defendants' fraudulent business practices. Relator is also a victim of Defendants' fraudulent schemes, which provided them with an unfair competitive advantage in the restaurant industry.

17. Relator has direct knowledge of the conduct alleged in this Complaint and conducted an independent investigation to uncover false claims submitted to the United States.

18. Accordingly, Relator is an "original source" of the information alleged in this Complaint within the meaning of the FCA.

19. Before filing this Complaint, Relator provided the government with a written disclosure of substantially all material evidence and information that Relator possessed, in

accordance with 31 U.S.C. § 3730(b)(2).

### B. Defendants

#### 1. GEN Korean Parent Companies

20. GEN Korean is a popular, fast-growing chain of Korean restaurants owned and controlled by David Kim and Jae Chang. Following a reorganization in 2022, GEN Korean currently operates under Gen Restaurant Companies, LLC, which is owned by Gen Restaurant Group, Inc.

21. Gen Restaurant Companies, LLC is a Delaware company headquartered at 11480 South Street, Suite 205, Cerritos, CA 90703. David Kim is the Manager of the company.

22. Gen Restaurant Group, Inc. is a publicly traded Delaware corporation headquartered at 11480 South Street, Suite 205, Cerritos, CA 90703. David Kim is Chairman and CEO of the company. Until January 8, 2025, Jae Chang served as co-CEO. The company's directors are Jae Chang, Michael B. Cowan, Jonathan Gregory, and David Park.

#### 2. Defendants Associated with David Kim

23. David Wook Jin Kim, a resident of California, is an extremely successful restaurateur and the former CEO of Baja Fresh Mexican Grill. As of May 2021, Kim owned numerous businesses, many of which operated locations of GEN Korean.

24. Gen Restaurant Management, LLC is a Delaware company headquartered at 11480 South Street, Suite 205, Cerritos, CA 90703. Kim was the former majority owner of the company and serves as the Manager of the company. Gen Restaurant Management, LLC served as the management and operations company for Kim's GEN Korean restaurants.

25. Kim is also the Manager of Gen Development, LLC, a Delaware company headquartered at 11480 South Street, Suite 207, Cerritos, CA 90703. In May 2021, Kim and/or Gen Development served as Manager or CEO of the following Defendants, nearly all of which are

Delaware companies[1] and all of which were headquartered at 11480 South St., Ste. 205, Cerritos, CA 90703 and had the following principal places of business:

a. Gen Alhambra, LLC, 68 W. Main St., Alhambra, CA 91801;

b. Gen Carrolton, LP, 2540 Old Denton Rd., Carrolton, TX 75006;

c. Gen Cerritos LLC, 11472 South St., Cerritos, CA 90703;

d. Gen Chino Hills, LP, 3370 Grand Ave., Chino Hills, CA 91709;

e. Gen Concord, LP, 1353 Willow Pass Rd., Concord, CA 94520;

f. Gen Fremont, LP, 43476 Boscell Rd., Ste. M6-B, Fremont, CA 94538;

g. Gen Frisco LP, 9292 Warren Pkwy, Ste. 150, Frisco, TX 75035;

h. Gen Houston LLC, 3201 Louisiana St., Ste. 101, Houston, TX 77006;

i. Gen Milpitas, LP, 190 Barber Ln., Milpitas, CA 95035;

j. Gen Mountain View, LP, 2540 W. El Camino Real, Mountain View, CA 94040;

k. Gen Northridge, LP, 10151 Reseda Blvd., Northridge, CA 91324;

l. Gen Pearlridge LLC, 98-1005 Moanalua Rd., Ste. 2211, Aiea, HI 96701;

m. Gen Rancho Cucamonga, LP, 11837 Foothill Blvd., Ste. A, Rancho Cucamonga, CA 91730;

n. Gen Rowland Heights, LP, 1388 Fullerton Rd., Ste. B, Rowland Heights, CA 91748;

o. Gen Sacramento LP, 1689 Arden Way, Ste. 1148, Sacramento, CA 95815;

p. Gen San Jose, LP, 1628 Hostetter Rd. Ste. F, San Jose, CA 95131;

q. Gen Torrance, LLC, 24301 Crenshaw Blvd., Torrance, CA 90505; and

---

[1] The only exceptions are Gen Frisco LP and Gen Houston LLC, both of which are organized in Texas, and Gen Pearlridge LLC, which is organized in Hawaii.

r. Gen Westgate, LP, 1554 Saratoga Ave. Ste. P401, San Jose, CA 95129.

26. Obu San Jose LP is a California company headquartered at 11480 South St., Ste. 214, Cerritos, CA 90703. Obu San Jose LP operates a restaurant called Obu Ramen House at 1098 E. Brokaw Rd., Ste. 10, San Jose, CA 95131. Its General Partner is Obu Development, LLC, which shared a headquarters with Obu San Jose LP. David Kim is the Managing Member of Obu Development, LLC.

### 3. Defendants Associated with Jae Chang

27. Jae Hyuk Chang founded GEN Korean in 2011 in Tustin, California. As of May 2021, Chang also owned many locations of GEN Korean, as well as several other restaurants.

28. Chang's GEN Korean restaurants were organized under several entities for which Chang served as Manager, including:

a. Gen Arizona LLC, an Arizona company operating a GEN Korean location at 2000 E Rio Salado Pkwy, Tempe, AZ 85288;

b. Gen California, LLC, a California company operating a GEN Korean location at 1300 S. Harbor Blvd., Fullerton, CA 92832;

c. Gen Nevada, LLC, a Nevada company operating GEN Korean locations in Sahara and Las Vegas, Nevada;

d. Gen Restaurant Group, LLC, a California company operating GEN Korean locations in Huntington Beach, Oxnard, and Tustin, California; and

e. JC Group International, LLC,[2] a California company operating GEN Korean locations in Corona, CA, West Covina, CA, and Henderson, NV.

---

[2] JC Group International, LLC was originally organized as JC Group International, Inc., for which Jae Chang served as CEO. In 2023, it was reorganized as JC Group International, LLC and Gen Restaurant Companies, LLC now serves as General Partner.

29. Chang was also the majority owner and Manager of Gen Restaurant Investment, LLC, a California company operating a GEN Korean location at 126 N. Artsakh Avenue, Glendale, CA 91206. Gen Restaurant Investment, LLC is 30% owned by Intelon Gen Investment LLC, a California company headquartered at 733 South Manhattan Pl., Unit 401, Los Angeles, CA 90005. Intelon is an EB-5 investment company whose members are Jang Lawrence Hyun Yoo, Jongtae Kim, and KLW Investment, LLC, a Delaware company headquartered at 8 Murica Aisle, Irvine, CA 92614.

30. Many of Chang's non-GEN businesses are California companies headquartered at 3930 Broadway Place, Los Angeles, CA 90037, and for which Jae Chang serves as Manager or CEO:

a. Broth Restaurant Group, LLC, which operates several locations of Shabuya, a Japanese restaurant, in California, Hawaii, and Nevada;

b. California Gogi Group, LLC, which operates a Korean restaurant called California Gogi at 4237 Campus Dr., Ste. 157-B, Irvine, CA 92612;

c. Octopus Restaurant Group, LLC, a California company operating a location of H20 Sushi & Izakaya at 9301 Tampa Ave., Northridge, CA 91324, and which formerly operated a second location of H20 Sushi & Izakaya in San Diego, CA (closed 2020);

d. Octopus Restaurant Long Beach, Inc., a California corporation operating Sumo Japanese Restaurant at 1714 Newbury Rd., Ste. C, Newbury Park, CA 91320, and which formerly operated H20 Sushi & Izakaya at 1870 Harbor Blvd #100, Costa Mesa, CA 92627, and Octopus Restaurant at 200 Pine Ave., Long Beach, CA 90802, both of which closed in 2020.

e. Pacific Global Distribution, Inc., a California corporation serving as a wholesale food distributor;

31. Chang is also CEO of Tomikawa Restaurant, Inc., a California corporation headquartered at 14191 Jeffrey Road, Irvine, CA 92620, and operating a Japanese restaurant called Tomikawa at the same location.

32. Chang is also the majority owner of Wise Universal, Inc., a California corporation headquartered at 1190 North Knollwood Circle, Anaheim, CA 92801, for which Changhwa Han serves as CEO. Wise Universal, Inc. is a wholesale food distributor.

## IV. STATUTORY AND REGULATORY BACKGROUND

### A. THE EFFECTS OF THE COVID-19 PANDEMIC ON THE RESTAURANT INDUSTRY

33. The restaurant industry has "a widely embedded, high level of business risk":[3] factors outside a restaurant's control, such as the ability and willingness of the public to patronize its business, can have a cataclysmic impact on the restaurant's financial health. "Profit margins in the restaurant industry tend to be extremely thin, and many restaurants, even at the best of times, are effectively only one upheaval, disaster, or major disruption away from losing viability."[4]

34. In 2020, the restaurant industry accounted for more than $300 billion in wages[5] and about 11 million jobs.[6] The industry constituted 4 percent of U.S. GDP.[7] A major blow to the

---

[3] Hyoung Ju Song *et al.*, *Impact of the COVID-19 Pandemic, Evidence from the U.S. Restaurant Industry*, 92 Int'l J. Hospitality Mgmt. 102702, at 1 (2021).

[4] Jennifer J. Otten *et al.*, *The State of the Washington State Food System During COVID-19: Taking Stock and Looking Ahead* 53-54 (2021), *available at* https://cms.agr.wa.gov/WSDAKentico/Documents/DO/Communications/WAFS-FinalReport.pdf.

[5] Neil Irwin, *One Simple Idea That Explains Why the Economy Is in Great Danger*, N.Y. Times (Mar. 17, 2020), https://nyti.ms/2QpRyeo.

[6] Charles Lew, *As Restaurants Go, So Goes the Economy*, Forbes (Apr. 20, 2020), https://www.forbes.com/sites/forbesbusinesscouncil/2020/04/20/as-restaurants-go-so-goes-the-economy.

[7] *Id.*

restaurant industry would result in dire follow-on effects throughout the American economy.

35. The COVID-19 pandemic devastated the restaurant industry. In April 2020, a survey of restaurant operators found that respondents believed their businesses had a 72% chance of survival if the pandemic lasted one month, a 30% chance of survival if the pandemic lasted four months, and a 15% chance of survival if the pandemic lasted six months.[8]

36. As public-health measures forced the closure of restaurants and domestic and international travel plummeted, the effects of the pandemic were even worse than many of those respondents feared. Nine months after that survey, as the pandemic continued and even worsened, the *New York Times* reported that "no industry has been clobbered like restaurants and bars."[9] The experience of Gertie, a popular Brooklyn restaurant, is emblematic of the struggles faced by restaurants and bars across the country:

> [In 2019], Gertie made about $30,000 a week, packing dozens of diners at a time inside its bright, cavernous dining room. During the worst days of the pandemic, it made $50 selling coffee and pastries on some mornings, not enough to pay the barista and baker. Sales slowly climbed through late summer [2020] to about $1,000 per day.[10]

37. Even after the most restrictive public-health measures were lifted and restaurants implemented safer dining protocols such as outdoor seating and air-filtration systems, many potential customers continued to stay home rather than dine out. Compounding these challenges,

---

[8] Michael G. Brizek *et al.*, *Independent Restaurant Operator Perspectives in the Wake of the COVID-19 Pandemic*, 93 Int'l J. Hospitality Mgmt. 102766, at 1 (2021).

[9] Matthew Haag, *Inside One Brooklyn Restaurant's Desperate Fight to Survive the Pandemic*, N.Y. Times (Nov. 1, 2020), https://www.nytimes.com/2020/11/01/nyregion/williamsburg-restaurant-reopening-brooklyn.html.

[10] *Id.*

restaurants struggled to pay their employees, leading them to quit in droves: every month from January through July 2021, five percent of the entire hospitality workforce quit their jobs.[11]

38. Ultimately, in 2020, "about 72,700 more restaurants and bars than normal closed, apparently due to the pandemic, a 95 percent jump over the average annual rate."[12]

## B. THE RRF PROGRAM

### 1. Overview

39. In the wake of these catastrophic events, Congress established the RRF Program in March 2021 as part of the American Rescue Plan Act of 2021. The law appropriated $28.6 billion in aid for the U.S. Small Business Administration (SBA) to distribute to certain businesses in the restaurant industry to offset their losses during the pandemic.[13]

40. The RRF Program was subject to various restrictions concerning which businesses could apply for funds, in what priority their applications would be reviewed, and how much funding they were eligible to receive. These requirements and limitations, all of which were material to the SBA's decision to award RRF grants, were published in several sources, including the RRF statute, the RRF grant application, the RRF Program Guide, and the RRF Knowledge Base, all of which have been at all relevant times readily available online for the public to view.

41. The RRF Program's restrictions included:

- **Eligible entity:** A business was eligible to receive RRF funding only if it was a "business in which the public or patrons assemble for the primary purpose of being served food or drink."[14] This included "a restaurant, food stand, food truck, food cart, caterer, saloon, inn, tavern, bar, lounge, brewpub, tasting room, taproom, licensed

[11] Alina Selyukh, *Low Pay, No Benefits, Rude Customers: Restaurant Workers Quit at Record Rate*, NPR (July 20, 2021), https://www.npr.org/2021/07/20/1016081936/low-pay-no-benefits-rude-customers-restaurant-workers-quit-at-record-rate.

[12] Tim Carman, *How Many Restaurants Closed from the Pandemic? Here's Our Best Estimate.*, Wash. Post (June 21, 2022), https://wapo.st/4kVlkEh.

[13] American Rescue Plan Act of 2021, Pub L. No. 117-2, § 5003(b)(2)(A), 135 Stat. 4, 86 (Mar. 11, 2021) (codified at 15 U.S.C. § 9009c(b)(2)(A)).

[14] 15 U.S.C. § 9009c(a)(4)(A).

facility or premise of a beverage alcohol producer where the public may taste, sample, or purchase products, or other similar place."[15]

- **Amount of funding:** The amount of an RRF grant was equal to the pandemic-related revenue loss of the eligible entity,[16] typically defined as the entity's gross receipts during 2020 subtracted from the entity's gross receipts in 2019.[17] Applicants were required to reduce this grant amount by the amount of PPP funding they had received.[18]

- **Limits on award:** Each eligible entity was entitled to a maximum of $5 million in funding per physical location and $10 million in total.[19]

- **Use of funds:** A grantee was permitted to use its grant funds only for ordinary expenses incurred as a direct result of, or during, the COVID-19 pandemic.[20]

- **Currently operating:** An applicant was eligible to receive funding only to support its "ongoing operations."[21] Accordingly, a business was ineligible to receive funding if it was permanently closed at the time of its grant application.[22]

**2. Application Process**

42. All applicants for RRF grants were required to, and did, submit their applications using SBA Form 3172[23] or through SBA-recognized point of sale ("POS") vendors, such as Square. Generally, applicants were also required to provide IRS Form 4506-T, three months of bank statements, their 2019 tax return, and documentation showing their 2020 gross receipts.

43. RRF applications were completed using the SBA's online portal, using a series of

---

[15] *Id.*

[16] *Id.* § 9009c(c)(4)(B)(i).

[17] *Id.* § 9009c(A)(7)(A).

[18] *Id.* § 9009c(a)(7).

[19] *Id.* § 9009c(c)(4)(A)(i)-(ii).

[20] *Id.* § 9009c(c)(5)(A)-(K).

[21] 15 U.S.C. § 9009c(c)(2)(A)(i).

[22] SBA, *Restaurant Revitalization Funding Program Guide* 3 (2021), *available at* www.sba.gov/sites/default/files/2021-04/Restaurant Revitalization Fund Program Guide as of 4.28.21-508_0.pdf; SBA, *RRF Knowledge Base – Is my business type eligible?*, https://ussbaforgiveness.zendesk.com/hc/en-us/articles/360059869371-Is-my-business-type-eligible (last visited June 30, 2025).

[23] Form 3172 is available at the following address: https://www.sba.gov/sites/sbagov/files/2021-04/SBA%20Form%203172%20RRF%20Application%204.20.21-508.pdf.

drop-down boxes and open-ended form fields to enter the appropriate information.[24] At all times during the application process, a button titled "Need Help" was displayed on the bottom-right corner of the screen:




44. Clicking this button opened a menu with convenient links to the SBA's website, the RRF Program Guide, and the RRF application form. In addition, applicants could use a text field to type questions, which would return results from the RRF Knowledge Base:




---

[24] Screenshots showing various steps in the application portal can be found on the SBA's website: https://www.sba.gov/sites/default/files/2021-04/2021.04.30%20-%20Application%20Portal%20Sample-508.pdf.

45. Once each applicant submitted its application and supporting documents electronically, the applicant was taken to a webpage where it executed a DocuSign package to finalize its application.

46. After opening the application process, the SBA was flooded with over 372,000 applications requesting $76 billion in funds, "far greater than its $28.6 billion authorized amount."[25]

47. In the face of this overwhelming volume of applications, the SBA was unable to carefully review every representation made by every applicant to determine whether they were true. Rather, RRF applications largely were processed on an honor system, with the SBA generally accepting applicants' representations at face value.

48. For instance, if an applicant certified that it belonged to a priority group, the SBA automatically assigned the applicant priority status, irrespective of whether that certification was true. Likewise, if an applicant certified that it was a restaurant, the SBA assumed the business was one where the public gathered primarily for the purpose of being served food and drink, without further inquiring or investigating whether that was true.

49. Numerous applicants were able to take advantage of the overwhelming and chaotic nature of the RRF application process to receive grants to which they were not entitled.

**3. Priority Status**

50. Under the RRF Program, the SBA was "required to provide priority to small businesses owned and controlled by women, veterans, and socially and economically disadvantaged individuals and to award grants only to these prioritized groups during the initial 21

[25] Adam G. Levin, Cong. Rsch. Serv., IF1189, *SBA Restaurant Revitalization Fund Grants* 2 (2022), *available at* https://crsreports.congress.gov/product/pdf/IF/IF11819.

days that the program was operational."[26] The SBA determined that, during the initial 21-day period, it would "accept applications from all eligible applicants but would distribute funds only to applicants that self-certified their eligibility as a prioritized group. Thereafter, the SBA would distribute grants in the order in which they were approved."[27]

51. Priority status was a crucial part of the RRF Program. As the original sponsor of the RESTAURANTS Act of 2020—which formed the basis for the RRF legislation—stated, the "devastat[ation]" of the COVID–19 pandemic "particularly … [affected] independent establishments that account for more than three-quarters of all restaurants and bars in the United States."[28] Because these small businesses often struggle to access capital markets, the RRF Program was "tailored to provide assistance for"[29] such businesses through its 20-location limit and priority status mechanisms.

52. In practice, priority status was one of the most important factors in determining whether an RRF applicant would receive funding. By May 26, 2021—the day before the SBA even began to review non-priority applications—the agency had already distributed $16 billion to 63,000 self-certified priority applicants.[30] In other words, 56% of the total amount Congress had allocated for the entire RRF Program went to just 17% of the applicants—all of whom were awarded priority status based solely on self-certifications.[31] By the time the SBA began to review non-priority applications, the remaining 215,000 applicants were competing for just $12.8 billion

---

[26] *Id.* at 1; *see* 15 U.S.C. § 9009c(c)(3)(A).

[27] Levin, *supra* note 25, at 1.

[28] 166 Cong. Rec. E538 (daily ed. June 15, 2020) (statement of Rep. Earl Blumenauer).

[29] 166 Cong. Rec. H5299 (daily ed. June 29, 2020) (statement of Rep. Earl Blumenauer).

[30] *See* Levin, *supra* note 25, at 2.

[31] *See id.*

in remaining funds.[32] Only approximately 38,000 applicants received an RRF grant after the 21-day priority period expired.

53. Therefore, an applicant's representation that it belonged to a priority group was an extremely important factor in determining whether the applicant would receive an RRF grant at all. An applicant that claimed priority status (and had no deficiencies or technical issues with its application) essentially had a 100% chance of receiving an RRF grant. An applicant that did not claim priority status had a 17.7% chance of receiving a grant.

54. Thus, businesses that self-certified as priority applicants had a significant—and often dispositive—advantage under the RRF Program.

55. Moreover, irrespective of the order in which applications were processed, the SBA strongly indicated that misrepresentations as to priority status were material to the agency's decision to award an RRF grant at all. For instance, the SBA advised applicants that if they reorganized their ownership for the purpose of qualification as a priority applicant, such behavior would "result in automatic disqualification of the award:"[33]

> **Can I change my business's ownership in order to qualify as a priority group?**
>
> 3 years ago · Updated
>
> No. An Applicant may not re-organize ownership on or after March 11, 2021, for the purpose of qualification for the priority period. Such re-organization will result in automatic disqualification of the award. Although Applicants self-certify that they are eligible as one of the priority groups, SBA reserves the right to request documentation from any Applicant.

---

[32] *See id.* The SBA received a total of 372,000 applications, but approximately 94,000 of these applications were flagged as obviously ineligible based on a cursory review.

[33] SBA, *RRF Knowledge Base – Can I change my business's ownership in order to qualify as a priority group?*, ussbaforgiveness.zendesk.com/hc/en-us/articles/360059869171-Can-I-change-my-business-s-ownership-in-order-to-qualify-as-a-priority-group (last visited Sept. 7, 2024).

56. But priority status under the RRF Program was subject to abuse. Because priority status was awarded based on a self-certification of eligibility, many businesses lied about their qualifications to gain an unfair competitive advantage.

### C. THE PAYCHECK PROTECTION PROGRAM

#### 1. Statutory and Regulatory Background

57. The PPP was a federal loan program overseen by the SBA to assist small businesses nationwide adversely impacted by the COVID-19 emergency.[34] Under the PPP, eligible businesses could obtain SBA-guaranteed loans to spend on payroll costs, rent or mortgage expenses, and other specified business expenses. PPP loans generally were awarded in the amount of an eligible entity's average monthly payroll costs in 2019, multiplied by 2.5.

58. Qualifying borrowers who exhausted the entirety of their first PPP loan (called a "first-draw PPP loan") on authorized uses were permitted to apply for a second PPP loan (called a "second-draw PPP loan").[35] Like first-draw PPP loans, second-draw loans were calculated based on the applicant's average monthly payroll costs, either for 2019 or for the 12 months preceding the application, at the election of the applicant. However, for borrowers who certified that they fell under a NAICS code beginning with 72 (pertaining to accommodations and food services) were eligible for a loan equal to 3.5 times their average monthly payroll costs.[36]

59. "Businesses that are part of a single corporate group" were limited to "$4,000,000 of Second Draw PPP Loans in the aggregate."[37] Businesses were considered part of a single

---

[34] Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, § 1102, 134 Stat. 281, 286 (Mar. 27, 2020) (codified at 15 U.S.C. § 636(a)(36).

[35] The second-draw PPP legislation is codified at 15 U.S.C. § 636(a)(37).

[36] 15 U.S.C. § 636(a)(37)(C)(iv)(I)(bb).

[37] Business Loan Program Temporary Changes; Paycheck Protection Program Second Draw Loans, 86 Fed. Reg. 3712, 3720 (Jan. 14, 2021).

corporate group if they were "majority owned, directly or indirectly, by a common parent."[38]

60. The SBA provided for forgiveness of both the principal and interest of first- and second-draw PPP loans. In order to receive forgiveness, borrowers were required to submit signed loan forgiveness applications and documents containing the information and certifications in SBA Form 3508, 3508EZ, or a third-party lender equivalent.

**2. Application Process**

61. The SBA delegated authority to third-party lenders to underwrite and approve the PPP loans. To obtain a PPP loan, a qualifying business (through its authorized representative) was required to sign and submit a PPP loan application online through the lender's application platform.

62. The PPP loan application required the business (through its authorized representative) to acknowledge the PPP Rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.

63. For example, applicants for PPP loans were required to certify in their PPP applications, among other things, that:

- "The applicant is eligible to receive a loan under the rules in effect at the time this application is submitted";
- "All SBA loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rule";
- "The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule";
- "[I]f the funds are knowingly used for unauthorized purposes, the federal government may hold [the Applicant] legally liable, such as for charges of fraud"; and

[38] Business Loan Program Temporary Changes; Paycheck Protection Program as Amended by Economic Aid Act, 86 Fed. Reg. 3692, 3702 (Jan. 14, 2021).

- "[T]he information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects."

64. Once the borrower submitted its PPP loan application to a lender, the participating lender processed the PPP loan application. If a PPP loan application was approved by the participating lender, it thereafter funded the PPP loan using its own monies, which were 100% guaranteed by the SBA.

65. After the lender processed and approved a borrower's PPP loan application, the lender submitted to the SBA the "Lender's Application - Paycheck Protection Program Loan Guaranty" applying for a guarantee on the loan. In that application, the lender certified that the borrower had made the required certifications regarding its eligibility. Therefore, if a borrower made misrepresentations on its PPP loan application, the borrower's false certifications caused the lender to submit a loan guarantee application to the SBA that contained the borrower's false statement.

66. The SBA provided for forgiveness of both the principal and interest of first- and second-draw PPP loans. In order to receive forgiveness, borrowers were required to submit signed loan forgiveness applications and documents containing the information and certifications in SBA Form 3508, 3508EZ, or a third-party lender equivalent. In their loan forgiveness applications, borrowers needed to certify and document, *inter alia*, their payroll costs and expenditures that would qualify for forgiveness. In addition, the PPP loan forgiveness application required the business (through its authorized representative) to make certain other certifications to be eligible to obtain forgiveness for a PPP loan.

67. For example, applicants for PPP loan forgiveness were required to certify in their PPP loan forgiveness applications, among other things, that:

- "The dollar amount for which forgiveness is requested . . . was used to pay business costs that are eligible for forgiveness";
- "[I]f the funds were knowingly used for unauthorized purposes, the federal government may pursue recovery of loan amounts and/or civil or criminal fraud charges";
- "The Borrower has accurately verified the payments for the eligible payroll and nonpayroll costs for which the Borrower is requesting forgiveness"; and
- "The information provided in this application and the information provided in all supporting documents and forms is true and correct in all material respects."

## V. DEFENDANTS' FRAUDULENT SCHEME

### A. RRF FRAUD

68. GEN Korean is a fast-growing Korean restaurant chain with approximately 40 locations throughout the United States. It was founded by longtime restaurateur Jae Chang and former Baja Fresh Mexican Grill CEO David Kim. There are thirteen GEN Korean locations in Texas, including in Arlington, Carrollton, Dallas, and Frisco. Kim and Chang also own several other restaurant businesses outside the GEN Korean portfolio.

69. As explained above, an applicant's representation that it belonged to a priority group was a crucial factor in determining whether the applicant would receive an RRF grant at all. Only the types of businesses enumerated in the RRF statute—as defined by the SBA regulations the statute incorporated—were eligible for priority status: woman-owned small businesses, veteran-owned small businesses, and small businesses owned by a socially and economically disadvantaged individual (commonly called Small Disadvantaged Businesses, or "SDBs").[39] Eight of Kim's companies and two of Chang's companies fraudulently obtained RRF grants by falsely representing that they were SDBs.

70. To qualify as an SDB, a business must meet two criteria. *First*, it must be

[39] 15 U.S.C. § 9009c(c)(3)(A).

considered a small business concern within the meaning of SBA regulations. *Second*, it must be owned by an individual within certain income and asset limits (in the case of an SDB).

71. To qualify as a small business concern, a business must meet the SBA's size standards at 13 C.F.R. § 121.201.

72. Applicants claiming that they qualified for priority status were required to make two certifications of eligibility on page 9 of the RRF application. The section pertaining to priority status directed applicants to "[s]ee the application instructions for applicable definitions." Moreover, on page 11, every applicant was required to certify that it had "read the statements included in this form … and underst[oo]d them." The application instructions explicitly specified that the SBA's size standards at 13 C.F.R. § 121.201 governed priority status eligibility:

> **A small business concern owned and controlled by socially and economically disadvantaged individuals** is a business concern (a business entity organized for profit, with a place of business located in the United States, and which operates primarily in the United States) that is considered small in accordance with SBA's size standards at 13 CFR § 121.201 and is at least 51 percent

73. The RRF Program Guide also informed Applicants that the size standards in 13 C.F.R. § 121.201 applied.[40]

74. The first paragraph of 13 C.F.R. § 121.201 explicitly states that the listed size limits apply to "a concern *and* its affiliates" (emphasis added). Because the application and Program Guide both explicitly refer to 13 C.F.R. § 121.201, no applicant could have any reasonable doubt as to whether the receipts of a business's affiliates counted in determining its status as a small business concern.

75. As full-service restaurants, this meant each business's average annual receipts, *plus* those of its affiliates, could not exceed $8 million[41] over the 3 or 5 years preceding its RRF

[40] SBA, *Restaurant Revitalization Funding Program Guide* 21-22 (2021).

[41] This was the prevailing limit for full-service restaurants (NAICS code 722511) at the time of the RRF applications. *See Small Business Size Standards: Adjustment of Monetary-Based Size Standards for Inflation*, 84 Fed. Reg. 34261, 34279 (July 18, 2019).

application.[42]

76. Businesses are affiliated when one has the power to control the other or a third party has the power to control both.[43]

77. At the time of their RRF applications, Kim owned and/or controlled the following businesses: Gen Alhambra, LLC, Gen Carrolton, LP, Gen Cerritos LLC, Gen Concord, LLC, Gen Houston LLC, Gen Northridge, LP, Gen San Jose, LP, Gen Torrance, LLC, and Gen Westgate, LP (the "Kim RRF Defendants").

78. At the same time, Kim also majority-owned and controlled another ten companies that did not receive RRF grants: Gen Chino Hills, LP, Gen Fremont, LP, Gen Frisco LP, Gen Milpitas, LP, Gen Mountain View, LP, Gen Pearlridge LP, Gen Rancho Cucamonga, LP, Gen Rowland Heights, LP, Gen Sacramento LP, and Gen San Jose, LP. Additionally, David Kim owned and controlled Gen Restaurant Management LLC, the management and operations company for his GEN Korean restaurants. Finally, David Kim controlled and operated GKBH Restaurant, LLC, which operated a GEN Korean location in Honolulu, Hawaii.

79. Taken together, the annual average receipts of the entities owned or controlled by Kim totaled approximately $100 million over the 3 or 5 years prior to the RRF applications, more than 12 times the $8 million limit to be considered a small business concern.

80. At the time of their RRF applications, Chang owned and/or controlled four restaurants (operating under two entities): Broth Restaurant Group, LLC and Gen California LLC (the "Chang RRF Defendants").

81. In addition, Chang was the sole or majority owner of nine more restaurants (operating under five entities) that did not receive RRF grants: California Gogi Group, LLC, Gen

---

[42] 13 C.F.R. § 121.103(a)(6).

[43] 13 C.F.R. § 121.103(a)(1).

Nevada LLC, Gen Restaurant Group LLC, Gen Restaurant Investment, LLC, and Octopus Restaurant Group, LLC. Finally, Chang also owned or majority-owned two food distribution companies: Wise Universal, Inc. and Pacific Global Distribution, Inc.

82. Taken together, the annual average receipts of the entities owned or controlled by Chang totaled approximately $100 million over the 3 or 5 years prior to the RRF applications, more than 12 times the $8 million limit to be considered a small business concern.

83. Nor were Kim or Chang economically disadvantaged individuals. At the time of the RRF applications, an applicant would not be considered economically disadvantaged unless their net worth was less than $750,000, excluding the value of their primary residence. In addition, an applicant would be presumed not to be economically disadvantaged if their annual income exceeded $350,000 and generally would not be considered economically disadvantaged if the fair market value of all their assets exceeded $6 million.

84. At the time of their businesses' RRF applications, Kim and Chang did not come close to meeting any of these criteria. For instance, Kim and Chang each owned more than $50 million in assets (and likely more), when taking into consideration their non-applicant affiliates.

85. In May 2021, the Kim RRF Defendants and the Chang RRF Defendants applied for RRF grants. In their applications, the Kim RRF Defendants and the Chang RRF Defendants made the following misstatements:

- Page 9: *As of the date of this application, Applicant is a small business concern at least 51 percent owned and controlled by ... Socially and economically disadvantaged individual(s).* The Kim RRF Defendants and the Chang RRF Defendants falsely checked the box next to this option to indicate it was true.
- Page 9: *The authorized representative of the Applicant must self-certify that the*

*Applicant is eligible for priority in awarding grants because the Applicant is an eligible small business concern owned and controlled by one or more ... socially and economically disadvantaged individuals ... by initialing here: ___.* The Kim RRF Defendants and the Chang RRF Defendants falsely initialed beside this statement to indicate it was true.

- Page 10: *I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects.* The Kim RRF Defendants and the Chang RRF Defendants falsely initialed beside this statement to indicate it was true.
- Page 11: *The Applicant is eligible to receive funding under the rules in effect at the time this application is submitted.* The Kim RRF Defendants and the Chang RRF Defendants falsely initialed beside this statement to indicate it was true.

86. The foregoing statements were false for the reasons stated above.

87. In May 2021, in express reliance on the Kim RRF Defendants and the Chang RRF Defendants' misstatements, the SBA approved the Kim RRF Defendants and the Chang RRF Defendants' applications and issued the following grants:

**Kim RRF Defendants**

| Date | Grant # | Entity | Amount | |
|---|---|---|---|---|
| 5/15/2021 | 2369819003 | Gen Carrollton LP | $ | 93,36 |
| 5/18/2021 | 2699899008 | Gen Concord LLC | $ | 2,089,35 |
| 5/19/2021 | 3693119001 | Gen Houston LLC | $ | 1,610,709 |
| 5/21/2021 | 5217599003 | Gen San Jose LP | $ | 2,001,284 |
| 5/22/2021 | 6604249008 | Gen Westgate LP | $ | 1,801,014 |
| 5/25/2021 | 7575119009 | Gen Torrance LLC | $ | 2,332,629 |
| 5/25/2021 | 7575379006 | Gen Cerritos LLC | $ | 1,063,012 |
| 5/26/2021 | 8036859003 | Gen Northridge LP | $ | 1,462,613 |
| 5/27/2021 | 8599609002 | Gen Alhambra LLC | $ | 1,351,532 |
| | | **TOTAL:** | **$** | **13,805,513** |

**Chang RRF Defendants**

| Date | Grant # | Entity | Amount |
|---|---|---|---|
| 5/21/2021 | 5218959006 | Gen California LLC | $ 2,963,182 |
| 5/27/2021 | 8619529000 | Broth Restaurant Grp., LLC | $ 3,294,308 |
| | | **TOTAL:** | **$ 6,257,490** |

88. Finally, Defendants misappropriated a significant portion of the RRF funds they had already fraudulently obtained. If an awardee failed to spend its entire grant amount on eligible expenses by March 11, 2023, it was required to return any unused funds to the Treasury. Furthermore, if a business was sold after receiving an RRF grant, it was required to remit the remainder of its grant to the Treasury.[44]

89. In 2021, Kim and Chang began the Initial Public Offering ("IPO") process to make GEN Korean a publicly traded company. In or about 2022, Kim and Chang sold all their individual GEN entities to a new entity—Gen Restaurant Companies, LLC—as part of a restructuring effort in preparation for its IPO.[45] Kim and Chang failed to spend a substantial amount of their RRF grant on eligible purposes by the time these entities were sold. The IPO was delayed due to a poor business climate in 2022, and GEN completed its IPO the following year.

90. Notwithstanding the reorganization, the deadline to spend RRF funds elapsed on March 11, 2023, at the latest. By then, Gen Restaurant Group, Inc. and the GEN Korean entities operating under its umbrella (including the Kim RRF Defendants and the Chang RRF Defendants) had still failed to account for at least $3.8 million of their RRF grant amounts. Nevertheless, Defendants failed to return the unspent funds to the government.

---

[44] SBA, *RRF Knowledge Base – How do I apply if I acquired an eligible business? Can I sell my business after I receive RRF funding?*, https://ussbaforgiveness.zendesk.com/hc/en-us/articles/360059662271-How-do-I-apply-if-I-acquired-an-eligible-business-Can-I-sell-my-business-after-I-receive-RRF-funding (last visited May 7, 2025).

[45] The operations of GEN Korean are now run through Gen Restaurant Companies, LLC, which is owned, in turn, by Gen Restaurant Group, Inc., another entity formed during the IPO process.

### B. PPP FRAUD

91. As explained above, businesses that were part of a single corporate group—meaning they were majority owned, directly or indirectly, by a common parent—were limited to $4,000,000 of second-draw PPP loans in the aggregate.

92. The following businesses, all of which were majority-owned and/or controlled by David Kim, obtained more than $9 million of second-draw PPP loans in the aggregate, or more than $5 million over the limit:

| Date | Loan # | Applicant | Amount | Forgiven |
|---|---|---|---|---|
| 2021-02-17 | 9512318408 | Gen Torrance LLC | $ 703,000 | $ 729,011.00 |
| 2021-01-29 | 8230458303 | Gen Concord LP | $ 450,600 | $ 467,272.20 |
| 2021-02-02 | 1452628408 | Gen San Jose LP | $ 505,800 | $ 524,514.60 |
| 2021-02-02 | 1916738405 | Gen Westgate LP | $ 449,000 | $ 465,613.00 |
| 2021-01-29 | 8172978307 | Gen Northridge LP | $ 621,800 | $ 644,806.60 |
| 2021-02-17 | 9428738402 | Gen Alhambra LLC | $ 432,500 | $ 448,502.50 |
| 2021-02-17 | 9512608401 | Gen Cerritos LLC | $ 694,300 | $ 719,989.10 |
| 2021-01-29 | 8519978307 | Gen Fremont LP | $ 533,600 | $ 553,343.20 |
| 2021-01-29 | 8630028302 | Gen Rancho Cucamonga LP | $ 444,300 | $ 460,739.10 |
| 2021-01-29 | 8419008301 | Gen Mountain View LP | $ 430,400 | $ 446,324.80 |
| 2021-02-02 | 1862078401 | Gen Sacramento LP | $ 386,700 | $ 401,007.90 |
| 2021-02-09 | 5678688405 | Gen Milpitas LP | $ 319,500 | $ 331,321.50 |
| 2021-02-17 | 9512868409 | Gen Chino Hills LP | $ 292,900 | $ 303,737.30 |
| 2021-02-02 | 1565648410 | Gen Rowland Heights LP | $ 285,700 | $ 296,270.90 |
| 2021-02-23 | 3129608510 | Gen Frisco LP | $ 244,400 | $ 253,442.80 |
| 2021-01-29 | 8618368307 | Gen Carrollton LP | $ 582,000 | $ 603,534.00 |
| 2021-02-10 | 6676508409 | Gen Houston LLC | $ 525,700 | $ 545,150.90 |
| 2021-01-02 | 5532588505 | Gen Pearlridge LLC | $ 505,400 | $ 524,099.80 |
| 2021-01-29 | 8161758305 | Gen Restaurant Mgmt. LLC | $ 443,800 | $ 460,220.60 |
| 2021-02-02 | 1878408409 | Obu San Jose LP | $ 153,300 | $ 164,157.10 |
| | | **TOTAL:** | **$ 9,004,700** | **$ 9,343,058.90** |

93. The following businesses, all of which were majority-owned and/or controlled by Jae Chang, obtained $4,617,000 in second-draw PPP loans in the aggregate, or $617,000 over the limit:

| Date | Loan # | Applicant | Amount | Forgiven |
|---|---|---|---|---|
| 2021-02-08 | 5269368402 | Gen California, LLC | $ 1,190,000 | $ 1,232,370.80 |
| 2021-03-01 | 5531528507 | Gen Restaurant Group, LLC | $ 1,513,600 | $ 1,569,603.20 |
| 2021-02-01 | 1343308407 | Gen Nevada, LLC | $ 331,400 | $ 343,661.80 |
| 2021-02-07 | 4810108410 | Broth Restaurant Group, LLC | $ 877,100 | $ 909,552.70 |
| 2021-02-01 | 1247248402 | Octopus Restaurant Group, LLC | $ 348,000 | $ 360,876.00 |
| 2021-02-01 | 1276448402 | California Gogi Group, LLC | $ 180,600 | $ 187,282.20 |
| 2021-02-01 | 1236728409 | Pacific Global Distribution, Inc. | $ 99,300 | $ 102,974.10 |
| 2021-02-04 | 3776578510 | Wise Universal, Inc. | $ 77,198 | $ 80,054.33 |
| | | **TOTAL:** | **$ 4,617,000** | **$ 4,786,375.13** |

94. Chang also controlled (as CEO or Manager) several businesses owned or co-owned by his wife, Ju Hee Han. These businesses received at least $2,846,800 in second-draw PPP loans. Insofar as Chang was the legal or *de facto* owner of these businesses as of February 2021—for example, if Chang and Han filed their taxes jointly, if a trust agreement granted Chang ownership, if Chang was entitled to a majority of the profit distributions of each business, or if Chang exercised the voting power of Ju Hee Han's shares formally or informally—their PPP loans were also over the $4 million limit and thus procured by fraud:

| Date | Loan # | Applicant | Amount | Forgiven |
|---|---|---|---|---|
| 2021-02-01 | 1313858407 | Gen Arizona LLC | $ 631,000 | $ 654,347.00 |
| 2021-02-10 | 6156898406 | JC Group International, Inc. | $ 1,129,400 | $ 1,171,187.80 |
| 2021-02-10 | 6460408404 | Octopus Restaurant Long Beach, Inc. | $ 758,900 | $ 786,979.30 |
| 2021-02-01 | 1348848404 | Tomikawa Restaurant, Inc. | $ 327,500 | $ 339,617.50 |
| | | **TOTAL:** | **$ 2,846,800** | **$ 2,952,131.60** |

95. The only GEN Korean entity that did *not* receive a second-draw PPP loan was Gen Restaurant Investment, LLC, which operates GEN Korean in Glendale, CA. Gen Restaurant Investment, LLC is majority-owned and controlled by Jae Chang and 30% owned by Intelon Gen Investment LLC, an EB-5 investment company. While Gen Restaurant Investment, LLC applied for a first-draw PPP loan, Intelon Gen Investment LLC applied for and received a second-draw PPP loan on Gen Restaurant Investment, LLC's behalf for $465,800 (loan no. 9512978407). However, Intelon was not the owner of Gen Restaurant Investment, was not permitted to apply for

or receive a PPP loan on another company's behalf, and fraudulently used Gen Restaurant Investment's payroll information to calculate its loan amount. Moreover, this loan should not have been distributed because Chang's entities had already exceeded the $4 million maximum.

96. Furthermore, Pacific Global Distribution, Inc. and Wise Universal, Inc.—food distributors owned or majority-owned by Jae Chang—exceeded the employee limit applicable to PPP loans. A company was eligible for a first-draw PPP loan only if the business and its affiliates had fewer than 500 employees; for second-draw PPP loans, the limit was reduced to 300 employees. Businesses with a NAICS code beginning with 72 (accommodations and food services) effectively were exempted from these limits. However, Pacific Global Distribution and Wise Universal did not qualify for this exemption, as they fell under NAICS code 424420 (Packaged Frozen Food Merchant Wholesalers). Likewise, Gen Restaurant Management, LLC (a management company, not a restaurant) was not eligible for the maximum employee exemption.

97. Including their affiliates, the dozens of businesses owned by Chang exceeded both the 300-employee limit and the 500-employee limit. Thus, the following loans were procured by fraud:

| Date | Loan # | Applicant | Amount | Forgiven |
|---|---|---|---|---|
| 2020-04-24 | 4092227104 | Wise Universal Inc | $ 77,000 | $ 78,324.40 |
| 2021-02-24 | 3776578510 | Wise Universal, Inc. | $ 77,198 | $ 80,054.33 |
| 2020-04-08 | 8293867004 | Pacific Global Distribution, Inc | $ 99,300 | $ 101,007.96 |
| 2021-02-01 | 1236728409 | Pacific Global Distribution, Inc. | $ 99,300 | $ 102,974.10 |
| 2020-04-07 | 6161547001 | Gen Restaurant Mgmt. LLC | $ 327,700 | $ 333,336.44 |
| 2021-01-29 | 8161758305 | Gen Restaurant Mgmt. LLC | $ 443,800 | $ 460,220.60 |
| | | **TOTAL:** | **$ 1,033,294** | **$ 1,155,917.83** |

98. Finally, the aforementioned GEN entities unlawfully transferred their RRF and PPP proceeds to investment companies and other businesses owned by Chang and Kim. After receiving tens of millions of dollars in government aid, Defendants could not possibly use the entirety of their grants and loans on ordinary business expenses (as required by the RRF and PPP rules). In

addition, some of the businesses received a large windfall (*e.g.*, Gen Torrance LLC, which received $4,026,529 in grants and loans) whereas others received more modest awards (*e.g.*, Gen Frisco LP, which received $438,200 in PPP loans). It was thus in Chang and Kim's interest to (illegally) commingle these funds so all their businesses could maximally benefit. Therefore, Chang and Kim laundered the funds through their various companies in the guise of ordinary expenses.

99. For example, Gen Arizona LLC (controlled by Chang) transferred funds to JC Holdings Group, LLC (also controlled by Chang) in the form of loan payments. These payments—effectively a transfer of money from one affiliate to another—allowed companies such as Gen Arizona LLC to dispose of a portion of their RRF grants and PPP loans in the form of debt payments, payroll costs, and/or other fees paid to entities controlled by the same parent. These were sham payments unrelated to any legitimate business expenses; rather, they functioned solely to assist Chang and Kim improperly commingle government funds and transfer them between their various businesses.

100. Chang and Kim's companies did not account for the aforementioned payments as related-party transactions, and they were not ordinary business expenses eligible for forgiveness under the PPP.[46]

## VI. CAUSES OF ACTION

**<u>COUNT I</u>**
**(AGAINST ALL DEFENDANTS)**
**(Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A))**

101. Relator incorporates by reference paragraphs 1-100.

---

[46] *See Business Loan Program Temporary Changes; Paycheck Protection Program—Treatment of Owners and Forgiveness of Certain Nonpayroll Costs*, 85 Fed. Reg. 52881, 52882 (Aug. 27, 2020) ("PPP loans are intended to help businesses cover certain non-payroll obligations that are owed to third parties, not payments to a business's owner that occur because of how the business is structured."

102. In violation of 31 U.S.C. § 3729(a)(1)(A), Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment to the United States government.

**COUNT II**
**(AGAINST ALL DEFENDANTS)**
**(Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(B))**

103. Relator incorporates by reference paragraphs 1-100.

104. In violation of 31 U.S.C. § 3729(a)(1)(B), Defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim.

**COUNT III**
**(AGAINST ALL DEFENDANTS)**
**(Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(G))**

105. Relator incorporates by reference paragraphs 1-100.

106. In violation of 31 U.S.C. § 3729(a)(1)(G), Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the government.

## VII. PRAYER FOR RELIEF

**WHEREFORE,** Relator respectfully requests that judgment be entered in favor of Relator and the United States and against Defendants as follows:

A. Treble the United States' damages in an amount to be determined at trial and such civil penalties as are required by law, under 31 U.S.C. § 3729(a);

B. An award of costs and fees, under 31 U.S.C. §§ 3729(a)(3) & 3730(d); and

C. Such further relief as is proper.

## VIII. JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable in this action.

Dated: July 10, 2025

Cary McDougal (Bar No. 13569600)
cmcdougal@baronbudd.com
**BARON & BUDD, P.C.**
3102 Oak Lawn Blvd, Suite 1100
Dallas, TX 75219
Telephone: 214.523.6253
Facsimile: 214.520.1181

Andrew M. Miller (Bar No. 24041483)
amiller@baronbudd.com
Noah M. Rich (*pro hac vice* to be filed)
nrich@baronbudd.com
**BARON & BUDD, P.C.**
The Watergate
2600 Virginia Ave. NW, Ste. 201
Washington, DC 20037
Telephone: 202.333.4562
Facsimile: 214.279.9915

JS 44 (Rev. 04/21) (TXND 4/21)

# CIVIL COVER SHEET

3-25CV1802-S

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

UNITED STATES OF AMERICA ex rel.
EIYO BOWL LLC

**(b)** County of Residence of First Listed Plaintiff ____________
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Cary McDougal, BARON & BUDD, P.C., 3102 Oak Lawn Blvd, Suite 1100 Dallas, TX 75219; 214.523.6253

## DEFENDANTS

Gen Restaurant Companies, LLC; Gen Restaurant Group, Inc.; David Wook Jin Kim; Jae Hyuk Chang; Michael B. Cowan; Jonathan Gregory; David Park; Ju Hee Han; Gen Restaurant Management LLC; Gen Development, LLC; Gen Alhambra, LLC; Gen Carrolton, LP; Gen Cerritos LLC; Gen Chino Hills, LP; Gen Concord, LLC; (Continued on Attachment A)

County of Residence of First Listed Defendant Los Angeles County, C
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

RECEIVED
JUL 10 2025
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [x] 1 U.S. Government Plaintiff
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*

*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

**REAL PROPERTY**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**CIVIL RIGHTS**
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty

Other:
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

**LABOR**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

**IMMIGRATION**
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

**BANKRUPTCY**
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- [ ] 375 False Claims Act
- [x] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing ***(Do not cite jurisdictional statutes unless diversity)***:
31 U.S.C. § 3730(b)(1)

Brief description of cause:
False Claims against the United States

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** [x] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE ____________ DOCKET NUMBER ____________

DATE
July 10, 2025

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # ________ AMOUNT ________ APPLYING IFP ________ JUDGE ________ MAG. JUDGE ________

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket. **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related cases, if any. If a related case exists, whether pending or closed, insert the docket numbers and the corresponding judge names for such cases. A case is related to this filing if the case: 1) involves some or all of the same parties and is based on the same or similar claim; 2) involves the same property, transaction, or event; 3) involves substantially similar issues of law and fact; and/or 4) involves the same estate in a bankruptcy appeal.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# ATTACHMENT A

**DEFENDANTS (CONT.)**

Gen Fremont, LP; Gen Frisco LP; Gen Houston LLC; Gen Milpitas, LP; Gen Mountain View, LP; Gen Northridge, LP; Gen Pearlridge LLC; Gen Rancho Cucamonga, LP; Gen Rowland Heights, LP; Gen Sacramento LP; Gen San Jose, LP; Gen Torrance, LLC; Gen Westgate, LP; Obu San Jose LP; Obu Development, LLC; Broth Restaurant Group, LLC; California Gogi Group, LLC; Intelon Gen Investment, LLC; KLW Investment, LLC; Jang Lawrence Hyun Yoo; Jongtae Kim; JC Group International, Inc; Octopus Restaurant Group, LLC; Octopus Restaurant Long Beach, Inc.; Pacific Global Distribution, Inc; Gen Arizona LLC; Gen California LLC; Gen Nevada, LLC; Gen Restaurant Group, LLC; Gen Restaurant Investment, LLC; Tomikawa Restaurant, Inc.; and Wise Universal, Inc.